## Case No. 14,688.

UNITED STATES v. BURLINGTON & M. R. R. CO.

[4 Dill. 297;[1] 3 Cent. Law J. 336.]

Circuit Court, D. Nebraska.  Jan., 1876.[2]

PUBLIC LANDS—GRANT TO RAILROADS—CONFLICT —LIMITS AND EXTENT OF GRANT—ANNULLING PATENT BY JUDICIAL DECREE.

1. There are no lateral limits to the grant of lands made by congress (13 Stat. 356, § 19) to the defendant company; in this respect differing from other grants mentioned.

[Cited in Missouri, K. & T. Ry. Co. v. Kansas Pac. Ry. Co., 97 U. S. 497.]

2. What lands are embraced in the description of the grant as being "on the line" of the said road defined, and the language held to mean that the lands shall be taken along a line parallel to the general direction of the road, on each side of it, and within lines perpendicular to its terminus at each end.

3. By the grant the company was entitled to patents for the lands earned "on the completion of any consecutive twenty miles" of its road: Held, that the company was not bound to apply for, or receive, its patents by sections of twenty miles as soon as completed, but might await the final completion of the road, and get all its lands at the same time. Held, also, patents will not be set aside where they represent only what the company was entitled to, even if they were issued too soon—the road being completed, and no injury having resulted to the government.

4. Construing the alleged conflicting grants to the defendant company, and the Union Pacific Railroad Company: Held, that the land department correctly decided that the title of the Union Pacific Railroad Company to lands within twenty miles of its road was paramount to the title of the defendant company.

5. There was no authority in the grant to issue patents for land on the north side of the

defendant's road, in lieu of lands deficient on the south side of its road, and such patents are void. But, in a bill to have such patents declared null, the lands must be described or identified.

Demurrer to a bill in equity, filed on behalf of the United States by the district attorney. The object of the bill is to have a declaration of the nullity, in whole or in part, of several patents of lands, issued to the defendant under section 19 of the act of July 2d, 1864, which was an act to amend the act "to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific Ocean, and to secure to the government the use of the same, for postal, military, and other purposes," approved July 1, 1862. 13 Stat. 356 [12 Stat. 489]. The questions made, and the facts on which they arose, appear in the opinion.

Mr. Neville, U. S. Dist. Atty.
Mr. Woolworth, for defendant.

MILLER, Circuit Justice. This case comes before me on a demurrer to a bill in equity, filed on behalf of the United States by the district attorney. The object of the bill is to have a declaration of the nullity, in whole or in part, of several patents for lands, issued to the defendant under section 19 of the act of July 2d, 1864, which was an act to amend the act "to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific Ocean, and to secure to the government the use of the same, for postal, military, and other purposes," approved July 1st, 1862. 13 Stat. 356.

The 18th section of this amendatory act of 1864 grants to the Burlington and Missouri River Railroad Company, an existing corporation under the laws of Iowa, the right of way, and the use of adjacent lands for earth, stone, timber, etc., through the territory of Nebraska, from the point on the Missouri river, south of the mouth of the Platte river, where it may choose to cross, to an intersection with the main track of the Union Pacific Railroad, not further west than the one-hundredth meridian of longitude.

Section 19, out of the construction of which the suit mainly arises, is here given verbatim: "Be it further enacted, that, for the purpose of aiding in the construction of said road, there be, and hereby is, granted to said Burlington and Missouri River Railroad Company every alternate section of public lands (excepting mineral land, as reserved by this act), designated by odd numbers, to the amount of ten sections per mile on each side of said road, on the line thereof, and not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached at the time the line of said road is definitely fixed: provided, that said company shall accept this grant within one year from the passage of this act, by filing said acceptance with the secretary of the interior, and shall

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

[2] [Affirmed in 98 U. S. 334.]

also establish the line of said road, and file a map thereof with the secretary of the interior, within one year from the date of said acceptance, when said secretary shall withdraw the lands mentioned in this grant from market."

1. The first question arising in the case comes out of the construction of this section asserted in the bill, that no lands are granted by this act outside of the lateral limit of twenty miles on each side of the road.

It is very difficult to perceive on what principles this construction can be maintained; no lateral limit is mentioned, nor any twenty miles. The grant is one of amount or quantity, and that quantity is to be had, subject alone to these restrictions: 1. The sections can only be of odd numbers. 2. They must be limited to ten per mile on each side of the road. 3. They must be on the line of the road. 4. They must be of lands not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or a homestead claim had not attached at the time the road was definitely located. There is no limitation by any lateral line. As it was very well known that the road must run through the most settled part of Nebraska, and that much of the land along its line was already disposed of, and that, within the two years allowed for the definite location of the road, much more of it would be claimed under homestead and pre-emption laws, it was clear to the framers of the act that the company could not get the amount of ten alternate sections on each side of the road, within a limit of twenty miles.

If it be said that all other grants, and especially the other grants of lands to the Pacific railroads, in the original and amended acts, have their lateral limits, we answer that the difference in the phraseology of the grant, and other circumstances, shows an intention not to limit it in this case.

There is, probably, no railroad grant to be found within those lateral limits, when the grant is of any "amount" or "number of odd sections." The phrase is always every alternate odd, or even, section within certain limits, and congress generally gives an indemnity on such of these sections as have been reserved or disposed of, by express language authorizing them to be selected elsewhere outside the limit. What is still more significant, is, that in this very act of 1864, the original grant of 1862 to the Union Pacific Company is increased from five sections on each side of the road to ten, and the existence of lateral limits of the original act is mentioned, but enlarged to twenty miles only on each side, to meet the increased number of sections granted. The 17th section of this act also grants to a corporation, thereafter to be organized, to build a road from Sioux City, in Iowa, to a junction with the Union Pacific, the same number of alternate sections of land for ten miles in width, on each side of the road. We are forced to the conclusion that when, after enlarging the limit of the original grant to the main road by section 4 of this act, and on granting to a new company lands to build the Sioux City branch by section 17, in both of which the lands were to be found within a certain limit, congress made this grant of a certain amount of such lands without such limit, it was intentional and of a purpose. 13 Stat. 356. The reason for this difference is also clear. For all the branches of the road mentioned in the act of 1862, of which the Sioux City branch was one, and the Burlington and Missouri River was not, there was a large subsidy of bonds of the United States, per mile, in addition to the lands granted by congress. But when, two years afterwards, that body authorized the Burlington and Missouri River Railroad Company to extend its road to a junction with the main road through Nebraska, and parallel, or nearly so, to this main road, it did not choose to give that company any bonds or money. And for this reason, as well as because such a large part of land had already been disposed of within a limit of twenty miles, it was deemed a reasonable measure of equalizing the donations to permit the whole amount of ten sections on each side of the road to be taken, if they could be found, without any lateral restriction.

2. The next allegation of the bill demanding attention, is, that a large number of the sections, or parts of sections, of land included in these patents, lie some fifty or a hundred miles distant from the road, and do not come within the description of the grant, as being "on the line thereof."

It is extremely difficult to fix any very precise meaning to this phrase. It is used in reference to the grant to the Union Pacific Company, in connection with the twenty-mile limit. It cannot, therefore, mean contiguous to the road-bed, or to the land taken for the road-bed, as a section of land twenty miles distant from the road-bed is clearly within the grant. If twenty miles distant is on the line, what limit in a lateral direction can you say is not? The equivalent phrase in the grant to the Sioux City branch is, "on each side of the same, along the whole length of said road." The line of the road seems here to be used for the course or direction of the road, and along its whole length means probably parallel with its course, and between its termini. And this is what I suppose is really meant: that the land shall be taken along, or parallel to, the general direction of the road, on each side of it, and within lines perpendicular to its terminus at each end.

3. The next section of this act, to-wit, section 20, provides, that when any consecutive twenty miles of the road has been completed, and this shall be made to appear to the president, "patents shall issue, conveying the right and title to said lands to said company, on each side of said road, as far as the same

is completed, to the amount aforesaid." And the bill insists that, when a patent issues for any section of twenty miles, no land could lawfully be included which did not lie parallel to that twenty miles, and within lines drawn perpendicular to each end of that twenty miles. It then alleges that this rule was disregarded, and large numbers of sections were included in the patents issued on the completion of every section of twenty miles, which lay east or west of the terminus of those sections, the road running nearly east and west.

It may be conceded that when the company presented their claim for the lands they were entitled to by reason of the completion of any specified section of twenty miles, they were only entitled to lands parallel to that section, and not either east or west of its respective termini, but they were neither bound to apply for, nor receive, their patents by sections of twenty miles. It was optional with the company to await the final completion of the road, and get all the lands to which they would have been entitled at the same time. What would they have been? Obviously, ten sections on each side of the whole length of the road, without regard to the section of twenty miles. Or, if the full quantity was not found on each twenty-mile section, when applied for in sections, within the limits of that sub-division, a patent might have been taken for what could be so found, and the remainder would be due to the company when the road was finished. If, then, the patents, as they now stand, only represent what the company was entitled to on the completion of the road, I think the error, if there was one, in issuing them too soon, does not require that they should be set aside, since the road has now been completed for two or three years, and no possible injury can result to the United States.

If my construction of the 19th section, and of the amendatory act, is sound, the defendant has received no more lands than it was entitled to by the mistake of the commissioners, or any other lands than what it would have had if it had received its patent for the whole after the road was finished. If these patents were set aside, the company could now ask that the same lands be re-patented to it.

4. The road of the defendant and the road of the Union Pacific Company run for many miles parallel to each other, and so near as to be within twenty miles of each other, on the south side of the road of the latter company.

In the selection of lands for the defendant company, the department of the interior refused to permit it to take any lands within the twenty miles on each side of the Union Pacific road, on the ground that the right of that company to the alternate odd sections, within that limit, was paramount to that of the Burlington and Missouri River Railroad Company. Thus, a strip of forty miles in width, on the north of the road of the defendant, was excluded from its selection. The bill before me now alleges that this was all wrong. That, first, the track of the Union Pacific had no grant at all of lands; and, secondly, if it had, it was only by the act of 1864, made at the same time with the grant to defendant, and, therefore, their rights were equal when the roads brought them in conflict.

The act of 1862 created a corporation called the Union Pacific Railroad Company, and authorized this company, and others named in the act, to construct a single line of road from the one-hundredth meridian of west longitude toward the Pacific Ocean, with three branches from this meridian eastward. One of these branches was to commence on the western boundary of Iowa, at such a point as the president should select, and thence to join the main road at the one-hundredth meridian. Specific grants of so much in bonds for each mile, and for so much land for each mile, were made to all these roads by the same act. Section 3 of the act, speaking of the Union Pacific, declares that there is hereby granted to said company, for the purpose of assisting in the construction of said railroad and telegraph line, every alternate section of public lands, to the amount of five sections per mile, on each side of said railroad, on the line thereof, and within ten miles on each side of the road. It is argued that, because the Iowa branch is separately described as such, and the road from the one-hundredth meridian of longitude to the western boundary of Nebraska is spoken of by the law as the line of the Union Pacific, no grant is given for the Iowa branch.

But the caption of the act speaks of a road from the Missouri river to the Pacific Ocean. The grants are made to build this road, and the branches as parts of it. There is nothing in the act to indicate, and no reason can be given why the lands on each side of the branch should not be given, as well as on the main road and the other branches. If the lands are not given for this branch, neither are the bonds. Yet the president, the secretary of the treasury, and of the interior, and subsequent acts of congress, have all recognized the grant, both of bonds and lands, as extending as well to this branch as to the other parts of the road. I do not doubt that there was such a grant intended, and that intent must control.

The original act, however (12 Stat. 492, § 3), only gave five alternate sections per mile on each side, within a limit of ten miles on each side of the road. By section 4 of the amendatory act of 1864, it is enacted that section 3 of the original act be hereby amended, by striking out the word "five," where the same occurs in said section, and by inserting in lieu thereof the word "ten;" and by striking out the word "ten," where the same occurs in said section, and inserting in lieu thereof the word "twenty." It will be

seen, on a comparison of the sections, that, as amended, it is a grant of ten sections on each side of the road, within twenty miles thereof. It is argued by counsel for plaintiff, that, as to the enlarged grant outside of the ten-mile limit, it is made by the same act, and takes effect as of the same date, as the grant to the Burlington and Missouri River Railroad Company, found in the subsequent section 19, and that where the lines of the road made a lap in which the right of selection conflicts, the alternate odd sections should have been equally divided between the two companies, and that the lands patented to the defendant, in lieu of those to which it was entitled within the limits of this conflict, were so done in violation of the law, and the patents are void. But I am of opinion that the land department correctly decided that the title of the Union Pacific Company, within twenty miles on each side of its road, was paramount and exclusive. Looking to the certainty that in some portions of their lines these roads must, before their connection, run parallel with each other within the twenty-mile limit of the Union Pacific, it seems reasonable that congress, instead of enlarging the grant to this road in general terms, used words which made the amendment a part of the original grant, for the purpose of having it take effect as of the date of that grant. In other words, it incorporates nunc pro tunc words which make that grant one for twenty miles on each side of its road. Whether this retrospective character would be given to the amendment, in a case where intervening rights had attached, we need not now decide. Probably it would not, but the Burlington and Missouri River Railroad Company takes its right by the same statute which says that the former act shall read so as to give the Union Pacific the lands now the subject of controversy. This view would commend itself to congress by its intrinsic equity, for by it each road gets the largest quantity of land which the statute permits, while the other construction allows the Burlington and Missouri Company to get all it could under any circumstances, the other road losing what the latter took within the lap. This comes out of the fact that the Burlington and Missouri Company was not confined within any lateral limits, while the Union Pacific could not go without its twenty-mile limit to make up deficiencies.

Besides, both of these roads have acquiesced in the construction given and acted on by the United States, the officers of the government having prescribed it as the one which should govern all their rights, the patents have been issued under it for the full amount of all the land which could be so claimed under both grants, and innocent purchasers have no doubt become owners of much of the land patented to the Union Pacific Company; and it is certainly all mortgaged, so that an incalculable amount of in-

justice would be done by holding all this void and setting aside the patents. If the patents are not absolutely void, and only voidable, then every principle of equity in the settlement of conflicting and doubtful rights acquiesced in by the parties, is opposed to setting aside these patents at the instance of the United States.

5. There remains one more ground for equitable relief relied on by the bill.

It is alleged that one hundred and fifty thousand acres of land lying on the north side of defendant's road, have been patented in lieu of lands found deficient on the south side of the road, and that the patents so issued are void.

I am of opinion that the act of congress did not intend to grant twenty sections per mile for the road, but ten sections per mile on each side of the road—that no right to take more on either side of the road than what amounted to ten sections per mile on that side was conferred. If, for any reason, the required number of sections could not be found on one side, it was as in the case of a similar deficiency in the twenty-mile limit of the other road, a loss which congress had made no provision to supply. There existed, therefore, no power in the office of the land department to issue patents for lands on the north side for those not found on the south side. If the lands so patented can be identified, I think that the government is entitled to have a declaration that as to these the patent conveys no title.

But the bill before me does not so identify them. I find no description of them by congressional sub-division, nor by reference to any patent containing them exclusively, nor by reference to any schedule of them. The court cannot declare all the patents issued void because there are some lands included in some of the patents which there was no right to convey.

As the bill stands, the demurrer must be sustained. If, however, the attorney for the United States thinks he can amend so as to identify these lands by specific description, he has leave to do so. If he does this, defendant can either renew his demurrer or answer to that part of the bill. If he renews his demurrer, it may be considered as overruled. If he chooses to abide the demurrer, a decree can go for the plaintiff for the lands so described. If plaintiff abides by his bill as it now stands, it must be dismissed on the demurrer.

Subsequently the district attorney amended the prayer of his bill (being unable to describe the lands specifically) and asked that the company be decreed to re-convey to the United States an equal amount of lands or pay the value of the excess, and to the bill as amended the circuit justice sustained a demurrer, being of opinion that the United States is not entitled to such relief, as neither the specific lands nor their value can be ascertained as a foundation for relief, nor the

value of the lands to be re-conveyed. Bill dismissed.

[Upon an appeal to the supreme court, the above decree was affirmed. 98 U. S. 334.]

Construction of land grant to Union Pacific Railroad Company and to the Sioux City branch (12 Stat. 489; 13 Stat. 356), see Sioux City & P. R. Co. v. Union Pac. R. Co. [Case No. 12,-909].